

**THOMAS J. CATLIOTA**
**U.S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
## at GREENBELT

| | | |
|---|---|---|
| In re: | * | Case No.   14-27167-TJC |
| James M. Blackston | * | Chapter    13 |
| Debtor | * | |
| *   *   *   *   *   *   *   * | * | |
| James M. Blackston | * | |
| Plaintiff | * | |
| vs. | * | Adversary No.  15-00236 |
| Seterus, Inc. and | * | |
| BAC Home Loans Servicing, L.P. | | |
| Defendants | * | |
| *   *   *   *   *   *   *   *   *   *   *   *   * | | |

## <u>MEMORANDUM OF DECISION</u>

Before the court are cross-motions for summary judgment filed by debtor/plaintiff James

Blackston ("Mr. Blackston"), defendant Seterus, Inc. ("Seterus"), and defendant Bank of

America, N.A. as successor by merger to BAC Home Loans Servicing, L.P. (collectively

"BANA").  *See* ECF 49, 50, 52, 53, 60, 64, 69, 70, 71, 77, 85, and 86.  Mr. Blackston's claims

are based on his contention that BANA, and then Seterus as the successor-servicer, acted

contrary to the loan documents by revoking the escrow account waiver on his deed of trust loan,

1

thereby causing an improper default on the loan when he failed to pay the monthly escrow component for taxes and insurance. As currently before the court, Mr. Blackston seeks relief against BANA on one count of negligence, and asserts five counts against Seterus: breach of contract, violation of the Maryland Consumer Protection Act, violation of the Maryland Mortgage Fraud Protection Act, negligence, and defamation.

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b). All parties have consented to the court entering a final order and judgment in accordance with Local Bankruptcy Rule 7012-1(b). ECF 94, 95, and 96. The court held a hearing on the cross-motions on July 6, 2016. For the reasons set forth in this ruling, the court will grant summary judgment to BANA and Seterus and deny Mr. Blackston's cross-motions.

**Statement of Material Facts Not in Dispute.**

In May 2006, Mr. Blackston entered into a loan with BANA secured by a deed of trust. ECF 49-3 and 49-4. The deed of trust encumbered 10412 Pookey Way, Upper Marlboro, Maryland (the "Property"). The parties agreed to waive the requirement for an escrow account for taxes and insurance (the "Escrow Waiver"). ECF 50-1 at p. 32 of 76. The Escrow Waiver was governed by an agreement that provided circumstances under which the borrower's actions could result in a revocation of the Escrow Waiver, such as failing to pay an expense when due, failing to give evidence of a paid expense, or failing to make timely note payments. *Id.* In addition, paragraph 3 of the deed of trust provided that BANA could revoke the Escrow Waiver at any time by notice. ECF 49-4 at p. 5-6 of 17.

The regular monthly payment without an escrow component was $2,417.67.

On July 9, 2012, Mr. Blackston sent a handwritten letter to BANA (the "July 9, 2012 letter"). ECF 53-8. The letter stated,

2

> I am requesting a review of my current financial situation to determine whether I qualify for the long term mortgage relief programs.
>
> *****
>
> My change in circumstances has made it necessary that I request that you work with me in an effort to modify this loan.
>
> *****
>
> Can we put together a plan that would be satisfactory to both myself and Bank of America?

*Id.* at p. 1-2.

In response to the July 9, 2012 letter, BANA sent Mr. Blackston a number of documents. ECF 53-9. These included a four-page Borrower Assistance Form, also known as Form 710. A copy of the four-page Form 710 is submitted in the record at ECF 53-9, and the parties agree this document was the blank Form 710 sent by BANA to Mr. Blackston in response to the July 9, 2012 letter.

On July 19, 2012, the Neighborhood Assistance Corporation of America ("NACA") submitted to BANA a package of documents seeking a modification of Mr. Blackston's loan (the "July 19, 2012 Package"). ECF 49-5, or Exh. C to the Cooper Aff. The July 19, 2012 Package contained a number of documents signed by Mr. Blackston or evidencing his electronic signature, and included an unsigned last page of Form 710.[1] ECF 49-5 at p. 10 of 16. The last page of Form 710 is headed "Borrower/Co-Borrower Acknowledgement and Agreement." Paragraph 10 of the last page of Form 710 states, "I agree that any prior waiver as to my payment of escrow items to the Servicer in connection with my loan has been revoked." *Id.* at ¶10.

The initial and primary source of the dispute between the parties is NACA's submission to BANA of the last page of Form 710 in the July 19, 2012 Package. Under the guidelines of the Home Affordable Modification Program ("HAMP"), an escrow fund is required for property taxes and insurance for a HAMP modification . ECF 50-1, Hall Aff. ¶13. Thus, lenders require

---

[1] As stated above, Form 710 is a four-page document, but the package submitted by NACA contained only the last page of Form 710.

a borrower seeking a HAMP modification to submit the Borrower/Co-Borrower Acknowledgement and Agreement, which acknowledges in paragraph 10 the borrower's agreement that any prior escrow waiver has been revoked.  Accordingly, when BANA received the last page of Form 710 from NACA in the July 19, 2012 Package, it operated on the understanding that Mr. Blackston had revoked the Escrow Waiver in order to seek the loan modification.  Based on this understanding, BANA paid real property taxes for the Property on August 3, 2012, in the amount of $2,089.14.

While Mr. Blackston acknowledges he began working with NACA in July 2012 concerning his mortgage loan options, and a number of documents in the July 19, 2012 Package contain his hard or electronic signature, he states in his affidavit that he did not apply for a loan modification with BANA on July 19, 2012, and that he did not complete nor submit to BANA a Form 710 in 2012.  ECF 70-1 at ¶20.[2]

The facts concerning whether NACA was authorized by Mr. Blackston to submit the Form 710 to BANA on his behalf and why it did so are not established on this record.  Thus, there are issues of fact in dispute concerning what, if any, affect NACA's submission to BANA of the last page of Form 710 in the July 19, 2012 Package had on the loan relationship between BANA and Mr. Blackston.  However, there is no basis to dispute the fact that, once BANA received the last page of Form 710 from NACA in the July 19, 2012 Package, it operated on the understanding, whether or not correctly, that based on paragraph 10 of Form 710, Mr. Blackston had revoked the Escrow Waiver.

By letter dated November 2, 2012, BANA notified Mr. Blackston that his request to remove the escrow account was denied.  ECF 49-6.  The letter stated that:

---

[2] However, Mr. Blackston's brief states that "[t]he application Mr. Blackston filled out and submitted to BANA provided in paragraph 10 that Mr. Blackston acknowledged revocation of the Waiver."  ECF 53-1, ¶13.  Mr. Blackston's counsel stated at the hearing that this statement was in error.

> Your escrow account currently has a negative balance . . . .
>
> The trial or permanent modification program approved for your loan requires an escrow account for the duration of the trial period or for the life of the loan if the permanent modification is approved.

*Id.*

Mr. Blackston was offered a modification by BANA, but he declined the modification apparently because the modification required a revocation of the Escrow Waiver.[3]

The monthly payment increased to $3,085.03, which represented the existing monthly payment for principal and interest of $2,417.67, plus a component for the escrow of taxes and insurance. Mr. Blackston, however, continued to pay the amount due for principal and interest, and did not submit a payment for the escrow component.

On December 1, 2012, BANA transferred the servicing of the loan to Seterus. According to BANA's records received by Seterus, an escrow account was active on the loan, the loan was transferred in default status due for the November 1, 2012 payment, and the escrow account had a deficient balance of $1,424.50.[4] ECF 62 at ¶7. Because Mr. Blackston did not submit a payment for the escrow component with his November payment, on December 16, 2012, Seterus sent a notice to Mr. Blackston stating his payment of $2,417.67 was less than full payment to satisfy the November 1, 2012 payment. ECF 78, Exh. B. On January 17, 2013, Seterus sent another letter to Mr. Blackston stating that his December 1, 2012 payment was less than the full amount due. *Id.*

On February 14, 2013, Mr. Blackston submitted a loan modification application to Seterus. He submitted, among other documents, an executed Form 710 which included the

---

[3] The reason Mr. Blackston declined the modification at that time is not established in the record as required by Fed. R. Civ. P. 56, applicable here by Fed. R. Bankr. P. 7056. *See* ECF 53-1 at ¶10 and Exh. F to ECF 53-1.

[4] Seterus initially stated that BANA made a payment for hazard insurance in August 2012. However, Seterus has corrected itself and recognized that BANA made the payment solely for real estate taxes in August 2012. *See* ECF 77 at p. 8 of 13, n. 10.

Borrower/Co-Borrower Acknowledgement and Agreement on the last page.  ECF 61, Exh. E to Hall Aff.  As described above, paragraph 10 of that document states "I agree that any prior waiver as to my payment of escrow items to the Servicer in connection with my loan has been revoked."  *Id*.

In March 2013, Seterus sent several notices to Mr. Blackston regarding his delinquent account, and it also offered him a loan modification.  Seterus also sent notice to Mr. Blackston on March 11, 2013, of a notice of intent to foreclose.  *Id.* at Exh. H to Hall Aff.  On March 13, 2013, Seterus also offered Mr. Blackston a trial period modification plan.  *Id.* at Exh. F to Hall Aff.  Seterus notified Mr. Blackston, on March 17, 2013, that his payment of $1,597.03, was less than full payment.  ECF 78, Exh. B.

On June 3, 2013, Seterus offered Mr. Blackston a permanent loan modification.  ECF 61, Exh. G to Hall Aff.  Mr. Blackston declined the loan modification.

On June 25, 2013, Mr. Blackston sent a letter to Seterus, which stated that BANA had paid the property taxes in error.  ECF 64-2.  Mr. Blackston wrote to Seterus on October 7, 2013, to request a clarification of his loan.  On October 25, 2013, Seterus responded and stated that Mr. Blackston had failed to pay hazard insurance in August 2012 while the loan was serviced by BANA.  ECF 53-10.  Seterus stated in the letter that due to Mr. Blackston's failure to pay hazard insurance BANA established an escrow account.  *Id.*[5]

On February 14, 2014, Seterus commenced a foreclosure action.

Mr. Blackston filed for chapter 13 bankruptcy relief on November 7, 2014.

### Conclusions of Law.

The standards that apply to the cross-motions for summary judgment are well established:

---

[5] *See supra* n. 4.

> In bankruptcy, summary judgment is governed in the first instance by Federal Rule of Bankruptcy Procedure 7056, which expressly incorporated into bankruptcy proceedings the standards of Federal Rule of Civil Procedure 56. A court may award summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986);  *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  In evaluating a summary judgment motion, a court "must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant."  *Apex*, 190 F.3d at 633.  In doing so, a court is not entitled to either weigh the evidence or make credibility determinations.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").  If the moving party is unable to demonstrate the absence of any genuine issue of material fact, summary judgment is not proper and must be denied.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

*In re French*, 499 F. 3d 345, 351-52 (4th Cir. 2007).  The court will first address the claim against BANA before turning to the claims against Seterus.

### The claim against BANA.

Mr. Blackston asserts against BANA a claim for negligence in administering and accounting for the loan.  He argues that BANA breached a duty owed to him when it failed to communicate that it revoked the Escrow Waiver, which in turn prevented him from addressing the problem prior to Seterus becoming the servicer.  This claim fails as a matter of law.

To assert a negligence claim a party must establish four elements: a duty owed to the plaintiff, a breach of that duty, a legally cognizable causal relationship between the breach of the duty and the harm suffered, and damages.  *See Jacques v. First Nat'l Bank of Maryland*, 515 A.2d 756, 758 (Md. 1986).  Here, the parties dispute whether BANA owed Mr. Blackston a tort duty.  It is well established that the court decides whether a legal duty exists.  *Legore v. OneWestBank, FSB*, 898 F.Supp.2d 912, 918 (D. Md. 2012).

As stated in *Jacques*,

> The mere negligent breach of a contract, absent a duty or obligation imposed by law independent of that arising out of the contract itself, is not enough to sustain an action sounding in tort. Still, while every contractual duty does not also impose a tort duty, [w]here a contractual relationship exists between persons and at the same time a duty is imposed by or arises out of the circumstances surrounding or attending the transaction, the breach of such duty is a tort and the injured party may have his remedy by an action on the case, or he may waive the tort and sue for the breach of the contract.

*Jacques*, 515 A.2d at 759 (internal quotations and citations omitted).

In *Jacques*, the court held that under the particular facts of that case, a bank, which agreed to process a loan application, owes its customer a duty of reasonable care in the processing and determination of that application. Subsequent to *Jacques*, a number of Maryland state and federal courts have considered if and when a tort duty arises in the context of a lender and borrower relationship. In *Parker v. Columbia Bank*, 604 A.2d 521 (Md. Ct. Spec. App. 1992), the Maryland Court of Special Appeals recognized that "special circumstances" may exist between a bank and its borrower that imposes on the bank a fiduciary or other duty over and above any contractual obligation. *Parker,* 604 A.2d at 532. The court noted, however, that "courts have been exceedingly reluctant to find special circumstances sufficient to transform an ordinary contractual relationship between a bank and its customer into a fiduciary relationship or to impose any duties on the bank not found in the loan agreement." *Id.*

The *Parker* court found compelling the analysis in *Tokarz v. Frontier Federal Sav. & Loan Ass'n*, 656 P.2d 1089 (Wash. App. 1982). It recognized the four special circumstances, identified in *Tokarz*, that might dictate a duty imposed on a bank in the context of a construction loan arrangement. *See Parker*, 604 A.2d at 533. The four circumstances include situations where "the lender (1) took on any extra services on behalf of the borrowers other than furnishing the money for a construction of a home; (2) received any greater economic benefit from the transaction other than the normal mortgage; (3) exercised extensive control over the

construction; or (4) was asked by the borrowers if there were any lien actions pending." *Id.* These special circumstances are not exclusive.

Before this court, there is nothing in the record that could lead to the conclusion that any special circumstances exist in this case. The loan transaction between BANA and Mr. Blackston is not a construction loan, but a straightforward mortgage loan that requires no special service, unusual control, or expertise or reliance. At its core, Mr. Blackston's claim is that BANA breached its contract with him by revoking the Escrow Waiver without providing proper notice. The obligations of both parties with respect to the Escrow Waiver were spelled out in the loan and other documents, specifically paragraph 3 of the deed of trust, the Escrow Waiver agreement and the Form 710, to the extent it applies. There are no special circumstances in this case to impose a tort duty on BANA nor is there a need to do so in light of the contract provisions between the parties.

Mr. Blackston argues that he paid a higher rate of interest for the loan because he received the Escrow Waiver, which places him within the second category of special circumstance identified in *Tokarz*. The court disagrees. If anything, the Escrow Waiver gave less control over the relationship since Mr. Blackston was required to satisfy the insurance and tax obligations directly. Moreover, a number of factors go into the determination of an interest rate on a loan, such as loan-to-value ratio, income ratios, credit worthiness of the borrower, and as alleged by Mr. Blackston in this case, the waiver of the requirement for an escrow account. The existence of different interest rate pricing factors do not constitute special circumstances.

The court's conclusion is buttressed by the holding in *Legore*, and the many cases it cites. As stated by the United States District Court of the District of Maryland, "[t]his Court agrees with every other court to consider the issue that the HAMP loan modification process does not

9

create the 'special circumstances' required to form a tort duty under Maryland law." *Legore*,
898 F.Supp.2d at 919 (citations omitted). Here, the undisputed facts establish that BANA did
not itself revoke the Escrow Waiver, but that it treated the Escrow Waiver as being revoked by
the Form 710 submitted by NACA in the July 19, 2012 Package. Thus, the dispute over the
effectiveness of Form 710 arises in what appears to be a HAMP modification request. Mr.
Blackston disputes he sought a modification on July 19, 2012, although he clearly requested a
modification in the July 9, 2012 letter he sent to BANA. S*ee* Exh. C to Cooper Aff. at Bates
Stamp Number 181, ECF 49-5 at p. 8 of 16 ("My change in circumstances has made it necessary
that I request that you work with me in an effort to modify the loan."). In any event, it is
sufficient to say here that to the extent Mr. Blackston was seeking a HAMP modification, his
negligence claim fails for the reasons stated in *Legore*. Even if Mr. Blackston was not seeking a
HAMP modification, the rationale of these cases applies. Accordingly, the court will dismiss
Mr. Blackston's negligence claim against BANA.

**The claims against Seterus**.

Mr. Blackston asserts five counts against Seterus: Count 1, for breach of contract; Count
3 for violation under the Maryland Consumer Protection Act; Count 4, for violation of
Maryland's Mortgage Fraud Protection Act; Count 5 for negligence; and Count 7 for defamation.
Like his claim against BANA, Mr. Blackston's claims against Seterus are based on his
contention that Seterus improperly revoked the Escrow Waiver, resulting in Seterus asserting an
improper loan default and wrongfully attempting to foreclose.

These claims must be considered in light of the undisputed material facts. Seterus began
servicing the loan on December 1, 2012. There is no dispute that, on February 14, 2013, Mr.
Blackston applied for a loan modification. He submitted to Seterus, among other documents, an

executed Form 710.  As described above, the last page of that document was the Borrower/Co-Borrower Acknowledgement and Agreement, which states in paragraph 10:  "I agree that any prior waiver as to my payment of escrow items to the Servicer in connection with my loan has been revoked."  ECF 61, Exh. E to Hall Aff.  Thus, it was entirely appropriate, at least after February 14, 2013, for Seterus to service the loan on the understanding that the Escrow Waiver had been revoked, because Mr. Blackston himself acknowledged the revocation in a signed writing.  The court concludes that any claim by Mr. Blackston that Seterus improperly serviced the loan after February 14, 2013, based on the allegedly improper revocation of the Escrow Waiver must fail as a matter of undisputable fact.

Mr. Blackston disputes the meaning of paragraph 10 of the Borrower/Co-Borrower Acknowledgement and Agreement in Form 710.  He argues that, when paragraphs 8 and 11 are read together with paragraph 10, the document supports his interpretation that the Escrow Waiver revocation would only be effective if he entered into a loan modification.  He argues therefore, that because he never entered a loan modification, there was no revocation of the Escrow Waiver.  The court disagrees.

"Under Maryland law, the interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law."  *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 234-35 (4th Cir. 2007) (quoting *Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005)).  "A contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person."  *Sy-Lene of Washington v. Starwood Urban Retail II, LLC.*, 829 A.2d 540, 547 (Md. 2003).  "In determining whether a writing is ambiguous, Maryland has long adhered to the law of the objective interpretation of contracts."  *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999).  *State v.*

*Attman/Glazer,* 594 A.2d 138, 144 (Md. 1991); *Cloverland, Inc. v. Fry,* 587 A.2d 527, 530 (Md.

1991); *Feick v. Thrutchley,* 586 A.2d 3, 4 (Md. 1991); *General Motors Acceptance v. Daniels,*

492 A.2d 1306, 1310 (Md. 1985); *Orkin v. Jacobson,* 332 A.2d 901, 903 (Md. 1975); *Kasten*

*Constr. v. Rod Enterprises,* 301 A.2d 12, 17-18 (Md. 1973). Under the objective view, a written

contract is ambiguous if, when read by a reasonably prudent person, it is susceptible of more

than one meaning. *Heat & Power Corp. v. Air Products & Chemicals, Inc.,* 578 A.2d 1202,

1208 (Md. 1990); *Truck Ins. Exch. v. Marks Rentals,* 418 A.2d 1187, 1190 (Md. 1980). The

determination of whether language is susceptible of more than one meaning includes a

consideration of "the character of the contract, its purpose, and the facts and circumstances of the

parties at the time of execution." *Pacific Indem. v. Interstate Fire & Cas.,* 488 A.2d 486, 488

(Md. 1985).

Therefore, when interpreting a contract the court's task is to:

> determine from the language of the agreement itself what a reasonable person
> in the position of the parties would have meant at the time it was effectuated.
> In addition, when the language of the contract is plain and unambiguous there
> is no room for construction, and a court must presume that the parties meant
> what they expressed. In these circumstances, the true test of what is meant is
> not what the parties to the contract intended it to mean, but what a reasonable
> person in the position of the parties would have thought it meant.
> Consequently, the clear and unambiguous language of an agreement will not
> give away to what the parties thought that the agreement meant or intended it
> to mean.

*General Motors Acceptance,* 492 A.2d at 1310. Further, the Fourth Circuit has explained how

these standards are to be applied on summary judgment:

> A court faces a conceptually difficult task in deciding whether to grant
> summary judgment on a matter of contract interpretation. Only an
> unambiguous writing justifies summary judgment without resort to extrinsic
> evidence, and no writing is unambiguous if susceptible to two reasonable
> interpretations. The first step for a court asked to grant summary judgment
> based on a contract's interpretation is, therefore, to determine whether, as a
> matter of law, the contract is ambiguous or unambiguous on its face. If a court
> properly determines that the contract is unambiguous on the dispositive issue,

> it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue. Even where a court, however, determines as a matter of law that the contract is ambiguous, it may yet examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis. If, however, resort to extrinsic evidence in the summary judgment materials leaves genuine issues of fact respecting the contract's proper interpretation, summary judgment must of course be refused and interpretation left to the trier of fact.

*Goodman v. Resolution Trust Corp.*, 7 F.3d 1123, 1126 (4th Cir.1993) (internal citations and quotations omitted).  "Therefore, summary judgment is appropriate when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence."  *Washington Metro. Area Transit Auth.*, 476 F.3d at 235.

The court begins with the operative provision.  Paragraph 10 provides that the signer agrees that "any prior waiver as to my payment of escrow items to the Servicer in connection with my loan has been revoked."  This language is plain and unambiguous.  Mr. Blackston offers no other explanation for this express language, which states in no uncertain terms that "any prior [escrow] waiver … has been revoked."

Rather than challenging the meaning of the language of paragraph 10, Mr. Blackston points to paragraphs 8 and 11 to support his point.  Paragraph 8 provides:

> If I am eligible for a trial period plan, repayment plan, or forbearance plan, and I accept and agree to all terms of such plan, I also agree that the terms of this Acknowledgment and Agreement are incorporated into such plan by reference as if set forth in such plan in full.

ECF 50-1, Exh. E to Hall Aff., p. 37 of 76.  Mr. Blackston argues that this provision means that the acknowledgements and agreements set forth in the form are only effective if he is granted a modification plan and he accepts and agrees to such a plan.  This argument is unpersuasive.  The operative language in paragraph 8 simply states that if the parties enter into a modification plan,

13

the "terms of this Acknowledgment and Agreement [will be] incorporated into such plan by reference as if set forth in such plan in full." It does not state that the acknowledgements and agreements made by the borrower will only be effective if a modification plan is entered into. Stated otherwise, stating that a provision will be incorporated into a future document does not mean it is not currently effective. Further, it cannot reasonably be disputed that many of the acknowledgements and agreements are meant to be applicable upon execution. For example, paragraph 1 states that the information submitted by the borrower is "truthful and the hardships identified above has contributed to the submission of this request for mortgage relief." *Id.* at ¶1. Under no reasonable interpretation of the document could it be said that the borrower certifies the accuracy of submitted information only if a modification plan is entered into. The same can be said for the other acknowledgements and agreements made, which are effective upon execution. *See, e.g.*, *id.* at ¶¶2, 3, 5, 6, 12, 13, and 14. Paragraph 10 is one such acknowledgement. Mr. Blackston's interpretation of paragraph 8 fails.

Mr. Blackston also points to paragraph 11 to support his position. It provides, "If I qualify for and enter into a repayment plan, forbearance plan, and trial period plan, I agree to the establishment of an escrow account and the payment of escrow items if an escrow account never existed on my loan." He argues this statement implicitly means the Escrow Waiver revocation is effective only if he accepts a modification plan. He further argues that paragraph 11 is superfluous under Seterus' interpretation of paragraph 10; if paragraph 10 effectuates the revocation of the Escrow Waiver, the borrower would be required to enter into an escrow account whether or not a modification plan is accepted. The court disagrees, for several reasons.

Initially, assuming for purposes of the motion that paragraphs 10 and 11 are in conflict, it is well established that "[w]here two clauses or parts of a written agreement are apparently in

conflict, and one is general in character and the other is specific, the specific stipulation will take precedence over the general, and control it." *Heist v. Eastern Sav. Bank, FSB*, 884 A.2d 1224, 1228 (Md. Ct. Spec. App. 2005) (citation omitted).  Paragraph 10 specifically governs the revocation of the Escrow Waiver.  The court determined above that paragraph 10 is plain and unambiguous.  It controls.

In addition, another

> well-established rule of contractual construction is that where two provisions of a contract are seemingly in conflict, they must, if possible, be construed to effectuate the intention of the parties as collected from the whole instrument, the subject matter of the agreement, the circumstances surrounding its execution, and its purpose and design. And, if a reconciliation can be effected by a reasonable interpretation, such interpretation should be given to the apparently repugnant provisions, rather than nullify any.

*Id.* (citation omitted).  Here, the subject matter of the document is a request to modify the loan. The document addresses the modification process and sets forth certain acknowledgements being made by the borrower upon which the lender relies in processing the application, and the understanding of what will occur if the modification is approved and effectuated.  It does not address what happens to the existing loan if there is no modification; the existing loan documents govern that instance.  Viewed in that context, paragraph 11 is simply the affirmative corollary to paragraph 10.  While paragraph 10 makes it clear that any escrow waiver is revoked, paragraph 11 requires the borrower to acknowledge that, if a modification plan is entered into, the borrower will be required to establish an escrow account upon modification even if one "never existed on [the] loan."  Paragraph 11 is not inconsistent with paragraph 10.  The court therefore concludes that paragraph 11 does not create an ambiguity in the interpretation of the otherwise unambiguous and straightforward language of paragraph 10.

Mr. Blackston also states that his submission of Form 710 to Seterus was compulsory because Seterus required him to do so.[6]  He does not state how this allegation provides a basis for relief, and has not cited any authority that would support relief for such a claim.[7]

Finally, Mr. Blackston argues that Seterus failed to notify him that it had revoked the Escrow Waiver, relying on paragraph 3 of the deed of trust.  That paragraph provides that "[l]ender may revoke the waiver as to any or all Escrow Items at any time by notice given in accordance with Section 15…" Exh. B to Hall Aff. at p.8; ECF 50-1 at p. 15 of 76.  The provision does not apply because Seterus did not revoke the Escrow Waiver.  Mr. Blackston did so no later than February 14, 2013, when he submitted the Form 710 to Seterus, to the extent he had not done so in the July 19, 2012 Package.

For the foregoing reasons, the court determines that Mr. Blackston's claims against Seterus after February 14, 2013, based on the allegation that it improperly revoked the Escrow Waiver cannot survive.  This leaves for consideration any claims Mr. Blackston has against Seterus from December 1, 2012, when it began servicing the loan, through February 14, 2013.

---

[6]  The court notes that Mr. Blackston's own statements are in conflict on this point.  In paragraph 26 of his affidavit, he states he completed the Uniform Borrower Assistance Form (*i.e.* Form 710) for NACA, his broker, in February 2013: "This application was to be distributed to multiple lenders for consideration of either loan modification or a 15 year refinancing…. The intent was for me to receive multiple offers and select the best one from various lenders. *Seterus was one of the lenders that the application was sent to.*"  ECF 71-1 at ¶26 (emphasis added).  He also states that he submitted the Form 710 to Seterus because it required him to do so and he "was not provided any other option to address my problem."  *Id.* at ¶27.  Because he has not cited any authority or legal principle that supports a claim for relief based on his statement that he was compelled to submit Form 710, the court need not address this factual inconsistency in resolving the motions for summary judgment.

[7]  To the extent Mr. Blackston is arguing he executed the Form 710 out of duress, the claim fails:
> "In order to establish duress, there must be a wrongful act which deprives an individual of the exercise of his free will." *Eckstein v. Eckstein,* 38 Md. App. 506, 379 A.2d 757, 761 (1978) (citing *Cent. Bank of Frederick v. Copeland,* 18 Md. 305 (1862)). There are generally two type of cases in which Maryland courts have found an agreement was made under duress, physical inducement and improper threat. *Emp'rs Ins. of Wausau v. Bond,* No. HAR–90–1139, 1991 WL 8431, at *2 (D. Md. Jan. 25, 1991). An improper threat is found where the threat "leaves the victim with no reasonable alternative other than to execute the agreement." *Id.* "This form of duress most often arises ... in the form of economic duress." *Id.*

*Wilson v. Ocwen Loan Servicing LLC*, 2013 WL 5276543, at *7 (D. Md. Sept. 18, 2013).  Mr. Blackston has not pointed to any facts that could meet this standard.

In Count 1, Mr. Blackston states a breach of contract claim against Seterus for improper revocation of the Escrow Waiver. Under Maryland law, to state a claim for breach of contract, a plaintiff "'must of necessity allege with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. 2012) (emphasis removed) (quoting *Cont'l Masonry Co. v. Verdel Constr. Co.*, 369 A.2d 566, 569 (Md. 1977)).

The threshold question is whether a contract exists between Mr. Blackston and Seterus. Here, the contracts in question are the deed of trust, promissory note, and Escrow Waiver agreement. Seterus was not a party to any of these agreements. Nor were these agreements assigned to Seterus. Therefore, Seterus is not a party to these agreements and cannot be held liable for breach of contract. *See Ayers v. Ocwen Loan Servicing,* 2014 WL 4269051, *4 (D. Md. 2014) (breach of contract claim was dismissed because the servicer did not owe a contractual duty to borrower); *see also Ruff v. America's Servicing Co.*, 2008 WL 1830182, *3 (W.D. Pa. 2008) (servicer was not a party to the mortgage and could not be held liable for breach of contract).

In Count 3, Mr. Blackston asserts a violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §13-301 *et seq.*, against Seterus. The MCPA prohibits "unfair or deceptive trade practices." *See* Md. Code Ann., Com. Law §13–301. Unfair or deceptive trade practices includes "[f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" and "[f]ailure to state a material fact if the failure deceives or tends to deceive." *Id.* at §13-301(1) and (3).

A private party bringing a claim under the MCPA must allege "(1) an unfair or deceptive practice or misrepresentation that is (2) relied upon, and (3) causes them actual injury." *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012), *aff'd*, 528 Fed. App'x 297 (4th Cir. 2013). The injury must be "objectively identifiable . . . [i]n other words, the consumer must have suffered an identifiable loss, measured by the amount the consumer spent or lost as a result of his or her reliance" on the misrepresentation. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007). Moreover, because the allegations of a MCPA claim sound in fraud, Fed. R. Civ. P. 9(b)'s heightened pleading standards (as made applicable in adversary proceedings by Fed. R. Bankr. P. 7009) apply. *See Haley v. Corcoran,* 659 F. Supp. 2d 714, 724 (D. Md. 2009).

The uncontradicted record establishes that when Seterus began servicing the loan, the loan had been designated by BANA (again, whether or not correctly) as subject to an escrow account and in default. Seterus simply serviced the loan based on that information. There are no facts in the record from which a factfinder could conclude that Seterus engaged in an unfair or deceptive practice or misrepresentation, and certainly no facts that could establish that Mr. Blackston relied upon any such actions. To the contrary, he argues that he challenged the revocation of the Escrow Waiver every step of the way and continues to do so.

In Count 4, Mr. Blackston asserts a violation of the Maryland Mortgage Fraud Protection Act ("MFPA"), Md. Code Ann., Real Prop. §7-401 *et seq.*, against Seterus. The MFPA states that "[a] person may not commit mortgage fraud." Md. Code Ann., Real Prop. §7–402. "Mortgage fraud" means any action by a person made with the intent to defraud that involves, among other things, "[k]nowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to

the mortgage lending process." *Id.* at §7–401(d)(1).  The MFPA provides a private right of action "for damages incurred as a result of a violation of this subtitle." *Id.* at §7–406(a)(1).

In order to state a claim under the MFPA, a plaintiff must make the same allegations as required to prove a general case of fraud.  *See Castle v. Capital One, N.A.*, 2014 WL 176790, at *5 (D. Md. Jan. 15, 2014), *aff'd*, 593 Fed. App'x 223 (4th Cir. 2015).  An MFPA claim must also meet the heightened pleading standard of Fed. R. Civ. P. 9(b).  *Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings, LLC*, 929 F. Supp. 2d 502, 532 (D. Md. 2013).

Mr. Blackston has not pointed to any facts that could support a fraud claim against Seterus from December 1, 2012, to February 14, 2013.  Mr. Blackston has not identified any facts from which a factfinder could conclude Seterus acted with intent to defraud Mr. Blackston.  And, again, he fails to establish reliance, since he contends he continually disputed that the Escrow Waiver had been revoked.

In Count 5, Mr. Blackston asserts a claim for negligence against Seterus.  This claim fails for the same reasons as his negligence claim against BANA fails, discussed above.  When there is economic loss, tort liability may be imposed when there is "an intimate nexus between the parties" that is satisfied by "contractual privity or its equivalent."  *Jacques*, 515 A.2d at 759-60.  Maryland courts have consistently found that there is not an intimate nexus between a mortgage servicer and its loan customer.  *Ayres v. Ocwen Loan Servicing, LLC*, 2014 WL 4269051, *4 (D. Md. Aug. 27, 2014); *see e.g.*, *Farasat v. Wells Fargo, Bank, N.A.*, 913 F. Supp. 2d 197, 207-08 (D. Md. 2012); *Bowers v. Bank of America, N.A.*, 905 F. Supp. 2d 697, 703 (D. Md. 2012); *Legore*, 898 F. Supp. 2d at 919 (collecting cases); *Parker*, 604 A.2d at 532.

In Count 7, Mr. Blackston asserts a defamation claim against Seterus for falsely reporting to credit reporting agencies that he was delinquent on his loan.  To prove a claim of defamation under Maryland law, a plaintiff must establish

> that the defendant made a defamatory statement to a third person; that the statement was false; that the defendant was legally at fault in making the statement; and that the plaintiff thereby suffered harm.  A defamatory statement is one which tends to expose a person to public scorn, hatred, contempt, or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person.

*Gohari v. Darvish*, 762 A.2d 321, 327 (Md. 2001) (internal quotations and citations omitted).

Section 1681h(e) of the Fair Credit Reporting Act (the "FCRA"), found in Title 15 of the U.S. Code, preempts state law defamation claims against any person who provides information to a consumer reporting agency, and provides the standard which a plaintiff must establish to assert such a claim.  It provides that:

> no consumer may bring any action or proceeding in the nature of defamation, invasion of privacy, or negligence with respect to the reporting of information against any consumer reporting agency, any user of information, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g, 1681h, or 1681m of this title, or based on information disclosed by a user of a consumer report to or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. §1681h(e); *see also Spencer v. Henderson-Webb, Inc.*, 81 F. Supp. 2d 582, 597 (D. Md. 1999) (the FCRA provides qualified immunity from state law defamation claims provided that it was not done with malice or willful intent to injure).  The FCRA requires that the false information must be furnished with "willful intent to injure" or "malice," which means that the creditor acted with "reckless disregard to the truth or falsity of the reported debt."  *Spencer,* 81 F. Supp. 2d at 598 (citing *Thornton v. Equifax, Inc.,* 619 F.2d 700, 705 (8th Cir. 1980)); *see also*

*Alston v. United Collections Bureau, Inc.*, 2014 WL 859013, *4-5 (D. Md. Mar. 4, 2014) (plaintiff must plead facts that the creditor had serious doubts as to the veracity of its reporting).

The *Alston* case is instructive. The plaintiff alleged that the creditor reported to the three credit bureaus that the plaintiff's account was past due. The plaintiff asserted that the creditor knew that the account was paid in full or that they were barred from collecting the debt because it fell outside of the statute of limitations, and argued that the inaccurate credit reports were published as a result. On a motion to dismiss, the court determined that the plaintiff had not pled sufficient fact to show that the creditor acted with the requisite malice or willful intent to injure when it reported that the account was delinquent. *Alston,* 2014 WL 859013 at *3-4. The court stated that there was nothing in the amended complaint that showed the creditor knew the information to be false or that it had serious doubts as to its veracity when it transmitted the information to the credit bureaus. *Id.*

Here, the court determined above that Seterus properly treated the Escrow Waiver as being revoked no later than February 14, 2013, when it received the executed Form 710 from Mr. Blackston. There is no dispute that after that date Mr. Blackston continued to make monthly payments at the lower amount without including the escrow component. Thus, after February 14, 2013, at the latest, Seterus was correct to report the loan as delinquent and any report to the credit agencies to that effect could not be defamatory.

This leaves for consideration whatever reports Seterus made during the period December 1, 2012, until after February 14, 2013.[8] There are no facts in the record from which a factfinder could determine that Seterus acted with willful intent to injure or a reckless disregard for the truth or falsity of the debt. Insofar as the record shows, Seterus began servicing the loan on

---

[8] The record does not establish the specifics of any credit reporting by Seterus, but contains only the statement that Seterus reported the loan as delinquent in December 2012 and after.

December 1, 2012, with the notation that an escrow account was required.  It received payments from Mr. Blackston in December 2012 and January 2013 that did not include the escrow component in the payment.  Apparently, it reported the loan as delinquent.  Nothing in the record could lead a factfinder to conclude that Seterus did so with the requisite state of mind.

## Conclusion.

For the foregoing reasons, the court concludes that there are no issues of material fact in dispute and BANA and Seterus are entitled to judgment as a matter of law.  Accordingly, the court will grant the motions for summary judgment of BANA and Seterus, and deny the motions by Mr. Blackston.  A separate order will follow.

cc:     All parties
        All counsel

**END OF MEMORANDUM OF DECISION**